**BROWER LAW GROUP, APC**
Steven Brower (CA SBN 93568) (*Pro Hac Vice*)
*Steve@BrowerLawGroup.com*
100 Pacifica, Suite 160
Irvine, California 92618
Telephone: (949) 668-0825

*Attorneys for Plaintiff*
*Greenberg Gross, LLP*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Greenberg Gross, LLP,<br>Plaintiff,<br>v.<br>GreenbergGrossLLP.com,<br>Defendant. | Case No. 2:25-cv-01176-MTL<br>**PLAINTIFF'S *EX PARTE* MOTION FOR ISSUANCE OF AN ORDER TO SHOW CAUSE REQUIRING NONPARTY NAMECHEAP, INC. TO APPEAR AND SHOW CAUSE WHY IT SHOULD NOT BE SANCTIONED FOR FAILURE TO COMPLY WITH THE ANTI-CYBERSQUATTING CONSUMER PROTECTION ACT** |

Plaintiff Greenberg Gross, LLP ("Plaintiff") respectfully applies to this Court, on an *ex parte* basis, for entry of an Order to Show Cause against third-party Namecheap, Inc. regarding its failures to comply with the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d).

In support of this request, Plaintiff respectfully refers the Court to the Memorandum of Points and Authorities below, the accompanying Declaration of Thanh-Thuy T. Luong, the attached exhibits, the [Proposed] Order, and all pleadings and records on file in this matter.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Namecheap, Inc. ("Namecheap") is a company accredited by the Internet Corporation for Assigned Names and Numbers ("ICANN") to act as a registrar and sell domain names to the public. Namecheap touts on its own website that it has over 24 million domains under management for customers around the world. (Luong Decl., ¶ 3, Ex. 1 at p. 3.)

Here, Plaintiff takes issue with Namecheap's management of the registration of the internet domain name <GreenbergGrossLLP.com> (the "Domain Name"). Specifically, Plaintiff contends that Namecheap breached its obligations under the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), when it allowed the Domain Name to be transferred to a new registrant after Plaintiff had notified Namecheap of the instant *in rem* action involving the Domain Name. To make matters worse, Namecheap provided the new registrant with privacy services which did allowed the new registrant's information to be redacted on the Whois record for the Domain Name.

When Plaintiff informed Namecheap of its violation of the ACPA and requested that Namecheap provide the new registrant's contact information so that Plaintiff could effectuate service of process, Namecheap refused and advised Plaintiff to seek court interventions, causing Plaintiff to incur additional costs and fees. Namecheap has continued to rebuff Plaintiff's efforts to resolve this dispute informally, necessitating this Court's intervention yet again.

Plaintiff hereby requests that this Court issue an order to show cause directing Namecheap to appear and show cause why it failed to comply with its obligations under the ACPA and why it should not pay monetary sanctions to compensate Plaintiff for expenses incurred as a result of Namecheap's noncompliance.

## II. BACKGROUND

### A. Procedural History

Plaintiff initiated this *in rem* proceeding on April 8, 2025. (Doc. 1.) Plaintiff filed an Amended Complaint on April 11, 2025. (Doc. 6.) By this action, Plaintiff seeks an order under the ACPA to transfer the Domain Name to Plaintiff.

When this action was filed on April 8, 2025, the Whois record for the registrant of the Domain Name was publicly listed as follows (*see* Doc. 1-2):

> Name: Diverse ISP
> Organization: Box 5601 AN, Accra-Ghana
> Email: marshalcage@gmail.com
> Mailing Address: 5601 Accra Ghana, Accra, Tesano, 00233, GH

On April 23, 2025, the Summons, Amended Complaint, and other case-related documents were personally served upon the Domain Name's registrar, Namecheap. (Doc. 13.)

On May 20, 2025, Plaintiff applied for entry of default, and mailed a copy of the Declaration for Clerk's Entry of Default to Namecheap. (Doc. 14, ¶ 2(i).) Thus, Namecheap was again notified of the pending lawsuit against the Domain Name.

The Clerk entered default on May 22, 2025. (Doc. 15.) On July 10, 2025, Plaintiff filed a Motion for Default Judgment, and mailed a copy of the filings to Namecheap. (Doc. 17.) This was the third time that Namecheap received filings in this matter, alerting it to Plaintiff's prosecution of the case against the Domain Name.

On September 9, 2025, the Court entered an order denying without prejudice Plaintiff's Motion for Default Judgment. (Doc. 19.) The Court stated that the *in rem* provisions of the ACPA required service upon the registrant of the Domain Name, and thus service on the registrar Namecheap was ineffective to confer *in rem* jurisdiction over the Domain Name. (*Id.*) Consequently, the Court set aside the Clerk's entry of default and ordered Plaintiff to effect service of process upon the registrant in Ghana in the manner specified in the ACPA within 60 days. (*Id.*)

On October 16, 2025, Plaintiff served the registrant Diverse ISP pursuant to the ACPA by sending a notice of violation to the registrant's address in Ghana through USPS international mail, and emailing a copy of the same letter to the email address associated with the registration. (Docs. 20-2, 20-3, 20-4.)

On October 21, 2025, Plaintiff's counsel emailed the registrar Namecheap regarding the registrant's information because the Whois record indicated that an update to the Domain Name had occurred on September 9, 2025, such that the registrant information became anonymized and was being displayed as follows:

> Name: Redacted for Privacy
> Organization: Privacy service provided by Withheld for Privacy ehf
> Email: be773048f0c24932bfb024eeca2a8c5d.protect@withheldforprivacy.com
> Phone: +354.4212434
> Mailing Address: Kalkofnsvegur 2, Reykjavik, Capital Region, 101, IS

(Doc. 20-13.) Plaintiff's counsel noted that the ACPA prohibits any modification to the Domain Name during the pendency of an *in rem* action, and requested Namecheap's cooperation in confirming that the registrant remained the same despite the redacted contact information, or otherwise provide the updated information. (*Id.*) On October 22, 2025, Namecheap responded by email, stating that it would not disclose the registrant's information absent a court order or subpoena. (Doc. 20-14.)

On November 10, 2025, Plaintiff filed an *ex parte* application seeking authorization to conduct early discovery to serve a subpoena on Namecheap for the registrant's unredacted information. (Doc. 20.) On November 13, 2025, the Court granted Plaintiff's application and permitted Plaintiff to serve a subpoena upon Namecheap. (Doc. 24.)

On November 14, 2025, Plaintiff's counsel emailed a copy of the Court's order authorizing early discovery along with a subpoena seeking the registrant's unredacted information. (Docs. 25-9, 25-10, 25-11.)

On December 8, 2025, Namecheap provided its response to the subpoena and produced documents. (Doc. 25-12.) Namecheap's records indicated that the new contact information for the registrant of the Domain Name was as follows:

> Name: Belvana Sela
> Organization: Golden Sea
> Address: Jl. Kebagusan 3, Pasar Minggu, Jakarta Selatan, DKI Jakarta, 12520
> Country: Cambodia
> Email Address: jrbomi27@gmail.com
> Phone Number: +855 965697187

(*Id.* at p. 6.)

Moreover, in its email response to the subpoena, Namecheap provided the following registration history for the Domain Name:

> Please be advised that the domain was registered as follows:
> 1. UN marshalcage 7/31/2024-7/31/2025
> 2. UN belvana 9/9/2025-Present

(*Id.* at p. 1.) Thus, despite the ACPA's clear mandate that the registrar shall not allow any changes be made to a domain name during the pendency of an *in rem* action, Namecheap allowed a new registrant to register the Domain Name.

On December 10, 2025, Plaintiff served the new registrant Belvana Sela pursuant to the ACPA by sending a notice of violation to the registrant's address in Jakarta through USPS international mail—incurring $75.55 in additional postage costs—and emailing a copy of the same letter to the email address associated with the registration. (Docs. 25-13, 25-14, 25-15.)

On January 14, 2026, Plaintiff filed an *ex parte* motion for an order waiving the ACPA's publication requirement and directing entry of default. (Doc. 25.) On February 12, 2026, this Court granted Plaintiff's ex parte motion, and entered an order waiving the requirement to effectuate service via publication and directing the Clerk to enter default of the Domain Name, which the Clerk performed that same day. (Docs. 29, 30.)

**B. <u>Plaintiff's Efforts to Resolve Dispute With Namecheap</u>**

On February 17, 2026, Plaintiff's counsel emailed Namecheap copies of the Court's 2/12/26 Order and the Clerk's Entry of Default, and inquired if Namecheap would agree to transfer the Domain Name to Plaintiff and reimburse Plaintiff for expenses incurred as a result of Namecheap's failure to comply with the ACPA. (Luong Decl., ¶ 4, Ex. 2.) On February 26, 2026, Plaintiff's counsel sent another email to Namecheap about its noncompliance. (*Id.*, ¶ 5, Ex. 3.) Namecheap replied the same day, stating it would transfer the Domain Name to Plaintiff, but remained silent as to its violation of the ACPA and Plaintiff's request for reimbursement. (*Id.*, ¶ 6, Ex. 4.) Namecheap's technical team then emailed Plaintiff's counsel with instructions for transferring the Domain Name. (*Id.*, ¶ 7, Ex.5.)

On February 27, 2026, Plaintiff's counsel emailed Namecheap to follow up on Plaintiff's grievance regarding Namecheap's noncompliance with the ACPA. (*Id.*, ¶ 8, Ex. 6.) When no response was received, Plaintiff's counsel followed up again on March 4, 2026. (*Id.*, ¶ 9, Ex. 7.) Namecheap responded that same day, stating that the matter is under review by its Senior Legal Department. (*Id.*, ¶ 10, Ex. 8.)

On March 9, 2026, Namecheap responded by email, stating that it had no obligation to place restrictions on the Domain Name because it "did not confirm receipt of a court order requiring the restriction of the subject domain [or] any direct requests by your firm for the subject domain to be placed on a litigation hold in relation to the named proceedings." (*Id.*, ¶ 11, Ex. 9.) Plaintiff's counsel replied that same day, noting that the ACPA only required that Plaintiff provide the registrar with a copy of a complaint, which was completed when a copy of the Amended Complaint was served on Namecheap on April 22, 2025, and attaching the proof of service thereof. (*Id.*, ¶ 12, Ex. 10; *see also* Doc. 13.)

On March 20, 2026, Namecheap sent an email explaining that the original registration expired on July 31, 2025, and was subsequently registered by a different

customer on September 9, 2025. (*Id.*, ¶ 13, Ex. 11.) On that basis, Namecheap asserted that it "did not facilitate a transfer of the domain from the original account to the second," but went on to "confirm that the domain is locked and available for transfer to [Plaintiff's] control." (*Id.*) Plaintiff's counsel replied the same day, noting that the ACPA prohibited not just transfers specifically, but also any modifications to the domain name generally, and that the Domain Name should have been locked upon Namecheap being served on April 23, 2025. (*Id.*, ¶ 14, Ex. 12.)

Plaintiff's lead counsel sent a further email on March 21, 2026, urging informal resolution of Plaintiff's request for reimbursement of expenses incurred as a result of Namecheap's violations of the ACPA, or otherwise Plaintiff would seek judicial intervention. (*Id.*, ¶ 15, Ex. 13.)

On March 27, 2026, Eugene Rome of Rome LLP emailed Plaintiff's counsel, identifying his firm as counsel for Namecheap, and attaching a letter with Namecheap's response to Plaintiff's request for reimbursement. (*Id.*, ¶¶ 16-17, Exs. 14-15.) Although Plaintiff filed this *in rem* action under the ACPA, Namecheap asserted that it had no obligation to monitor the Domain Name under the Uniform Domain-Name Dispute-Resolution Policy ("UDRP"), an entirely separate process established by ICANN. (Ex. 15 at p. 2.) Namecheap also argued that a registrar is not liable under the ACPA absent a "bad faith intent to profit." (*Id.* at p. 3.) On those grounds, "Namecheap decline[d] to reimburse Greenberg for the requested fees," and "Namecheap's decision is final." (*Id.*)

Because Plaintiff's efforts to informally resolve its dispute with Namecheap over the registrar's noncompliance with the ACPA have been unproductive, Plaintiff hereby seeks this Court's intervention.[1]

[1] Namecheap transferred the Domain Name to Plaintiff on or about April 14, 2026. (Luong Decl., ¶ 19.) As such, Plaintiff is not seeking any relief regarding the Domain Name itself.

## III. ARGUMENT

### A. Legal Standard

The ACPA imposes the following obligations on the registrar when a domain name is the subject of an *in rem* action:

> (i) The remedies in an in rem action under this paragraph shall be limited to a court order for the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark. **Upon receipt of written notification of a filed, stamped copy of a complaint filed by the owner of a mark in a United States district court under this paragraph, the domain name registrar, domain name registry, or other domain name authority shall—**
>
> > (I) expeditiously deposit with the court documents sufficient to establish the court's control and authority regarding the disposition of the registration and use of the domain name to the court; and
> >
> > (II) **not transfer, suspend, or otherwise modify the domain name during the pendency of the action, except upon order of the court**.
>
> (ii) The domain name registrar or registry or other domain name authority shall not be liable for injunctive or monetary relief under this paragraph **except in the case of bad faith or reckless disregard**, which includes a willful failure to comply with any such court order.

15 U.S.C. § 1125(d)(2)(D) (emphasis added).

Significantly, there is no requirement that the registrar be a named party in the action. And there is no requirement that the documents be "served" on the registrar. Rather, the requirement is that the registrar receive "written notification" of the Complaint. Upon receipt of such written notification the obligations of the statute are automatically deemed effective.

Thus, the ACPA provides that a registrar may be liable for monetary relief if it fails to comply with its obligations under the *in rem* provisions. In addition to this statutory remedy, it is well-settled that "a federal court may levy sanctions under its inherent power." *Fink v. Gomez*, 239 F.3d 989, 991 (9th Cir. 2001). It is further

recognized that a federal court is empowered to impose sanctions "to compensate the complainant for losses sustained." *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992).

**B. Plaintiff Notified Namecheap of This *In Rem* Action as Required by the ACPA**

The *in rem* provisions of the ACPA provides that a domain name is deemed to have its situs in the judicial district in which the domain name registrar is located. 15 U.S.C. § 1125(d)(2)(C). Because Namecheap is located in Phoenix, Arizona (*see* Ex. 1 at p. 9), Plaintiff filed this *in rem* action in the District of Arizona. Thus, this forum is less convenient for Plaintiff than for Namecheap.

Thereafter, Plaintiff set out to notify Namecheap of this action. The ACPA merely requires that the registrar be provided with a "written notification of a filed, stamped copy of a complaint," without specifying the method of delivery. 15 U.S.C. § 1125(d)(2)(D)(i). Although postal mail would have been more convenient and less costly, Plaintiff engaged a process server to serve the Complaint on Namecheap, incurring the additional expense to better ensure that Namecheap received the documents and take actions as necessary. (Docs. 12, 13.)

Namecheap's obligations under the ACPA were triggered on April 23, 2025, when Plaintiff's process server served a copy of the Amended Complaint on Namecheap's agent for service of process. (Doc. 13.)

**C. Namecheap Failed to Comply With Its Obligations Under the ACPA**

As an initial matter, the docket shows that Namecheap never deposited any documents with this Court regarding the Domain Name so as to establish the Court's control and authority over the Domain Name. Thus, Namecheap failed to comply with 15 U.S.C. § 1125(d)(2)(D)(i)(I).

More importantly, it is Namecheap's failure to comply with the requirements set forth in 15 U.S.C. § 1125(d)(2)(D)(i)(II) that has directly harmed Plaintiff. Upon

being served with a copy of the Amended Complaint on April 23, 2025 (Doc. 13), Namecheap should have placed restrictions on the Domain Name so that others may not "transfer, suspend, or otherwise modify the domain name during the pendency of the action."

Instead, Namecheap waited until about March 20, 2026—almost a year later—to "confirm that the domain is locked." (Luong Decl., ¶ 13, Ex. 11.) In the interim, however, Namecheap had allowed the Domain Name to be registered to a new, anonymous registrant on September 9, 2025. (Doc. 25-12.) Accordingly, Namecheap breached its obligation under the ACPA.

**D. Namecheap Acted With Bad Faith or Reckless Disregard**

Plaintiff had a process server serve copy of the Amended Complaint upon Namecheap on April 23, 2025. (Doc. 13.) Though not required by the ACPA, Plaintiff continued to provide Namecheap with copies of the filings in this action. When Plaintiff filed its request for entry of default on May 20, 2025, Plaintiff had a copy of the filing mailed to Namecheap. (Doc. 14, ¶ 2(b).) When Plaintiff filed its motion for default judgment on July 10, 2025, Plaintiff also mailed a copy of the filings to Namecheap. (Doc. 17-3.)

Despite receiving multiple notices that Plaintiff was actively prosecuting this *in rem* matter against the Domain Name, Namecheap did not place any restrictions on the Domain Name. As a result, a new registrant was able to register the Domain Name on September 9, 2025. (Doc. 25-12.) To put it another way, Namecheap was able to sell the Domain Name to a new registrant even though there was pending litigation.[2] And to make Namecheap's services more appealing to the registrant,

[2] Although only one domain name is at issue in this case, when considering Namecheap's business strategies and policies, it is worth bearing in mind that Namecheap has over 24 million domains under its management. (Ex. 1 at p. 3.)

Namecheap allowed the new registrant to Namecheap's privacy services so that anonymized information would be displayed on the Whois record. (Doc. 25-2.)

Notwithstanding Namecheap's business strategy, Namecheap had the opportunity to mitigate Plaintiff's damages when Plaintiff alerted Namecheap to its violations of the ACPA. When Plaintiff's counsel contacted Namecheap seeking confirmation of the registrant's information on October 20, 2025, Namecheap could have cooperated and disclosed the requested information. (Doc. 20-13.) Instead, Namecheap stated that it would not disclose the registrant's information absent a court order or subpoena. (Doc. 20-14.) Thus, Plaintiff was forced to incur attorney's fees in filing an ex parte application seeking this Court's authorization to conduct early discovery. (Docs. 20, 24.) Plaintiff would not have incurred those attorney's fees and costs if not for Namecheap's reckless disregard in failing to lock the Domain Name despite receiving multiple notices of this litigation from Plaintiff.

Additionally, Namecheap acted in bad faith by its apparent predisposition to willfully misunderstand its obligations under the ACPA to avoid liability. In its email on March 9, 2026, Namecheap attempted to deny receipt of Plaintiff's notifications by creating a new requirement for Plaintiff, stating that Namecheap "did not confirm receipt of any direct requests by your firm for the subject domain to be placed on a litigation hold in relation to the named proceedings." (Ex. 9.) But the ACPA merely requires Plaintiff to provide the registrar with a filed, stamped copy of the complaint, which Plaintiff did by using a process server. 15 U.S.C. § 1125(d)(2)(D)(i). At that point, the ACPA contemplates a registrar would be aware of its obligations upon receipt of such a pleading and place the necessary restrictions on the Domain Name while the case remains pending.

Namecheap then tried to argue that it "did not facilitate a transfer of the domain from the original account to the second" because the original registration expired and was subsequently registered by a new user. (Ex. 11.) But the ACPA

prohibits any modifications to the domain name, not just transfers. 15 U.S.C. § 1125(d)(2)(D)(i)(II).

Namecheap's counsel has also misconstrued the nature of this dispute, whether negligently or intentionally, and the applicable law. As an ICANN-accredited registrar, Namecheap is subject to ICANN's Registrar Accreditation Agreement ("RAA"). (Luong Decl., ¶ 18, Ex. 16.) Namecheap conceded as much by referencing the RAA in its letter denying Plaintiff's request for reimbursement. (*See* Ex. 15 at p. 2.)

Namecheap contends that it was allowed to resell the Domain Name to a new registrant after the original registration expired because, under the RAA, it had no duty to monitor the domain name during the pendency of a UDRP dispute. (Ex. 15 at p. 2.) However, the UDRP is an entirely separate process established by ICANN, and has no bearing on an *in rem* action under the ACPA. Furthermore, the RAA governs the relationship between ICANN and the registrar, and in no way delimits the registrar's obligations to ACPA plaintiffs. To the contrary, Paragraph 3.7.2 of the RAA expressly requires that the "Registrar shall abide by applicable laws and governmental regulations." (Ex. 16 at p. 11.)

Namecheap's counsel cites Paragraph 3.7.5.7 of the RAA for the proposition that a registrar may allow a domain name to proceed through its natural cycle of registration, expiration, and resale during the pendency of a UDRP proceeding if one of the disputants does not renew. (Ex. 15 at p. 2.) But the RAA provision applicable to this *in rem* action is Paragraph 3.7.5, which states: "At the conclusion of the registration period, failure by or on behalf of the Registered Name Holder to consent that the registration be renewed within the time specified in a second notice or reminder shall, <u>in the absence of extenuating circumstances</u>, result in cancellation of the registration by the end of the auto-renew grace period (although Registrar may choose to cancel the name earlier)." (Ex. 16 at p. 11, emphasis added.) The term "extenuating circumstances" is defined in Paragraph 3.7.5.1 to include a "domain

name subject to litigation in a court of competent jurisdiction." (*Id.* at p. 12.) Thus, even under the RAA, a pending ACPA action is grounds for Namecheap to disrupt the natural registration lifecycle and place a lock on the domain name at issue. Accordingly, Namecheap's reliance on the RAA as the basis to deny liability to Plaintiff is maintained in bad faith.

**E. Namecheap Is Liable to Plaintiff Under the ACPA**

Namecheap argues that it is insulated from liability for monetary damages because it had no "bad faith intent to profit" and because it implemented a reasonable policy embodied in the UDRP. (Ex. 15 at p. 3.)

Namecheap's argument that a registrar may only be liable for monetary damages where there was a "bad faith intent to profit" misses the mark. The *in rem* provisions of the ACPA sets a different standard, providing that a domain name registrar may be liable for monetary relief "in the case of bad faith or reckless disregard." 15 U.S.C. § 1125(d)(2)(D)(ii). As discussed above, Namecheap acted with bad faith and reckless disregard in its handling of the Domain Name.

While the UDRP may be deemed to be a reasonable policy for the resolution of disputes that proceed through that mechanism, it has no bearing here because Plaintiff is proceeding under the ACPA. Tellingly, Namecheap has not offered any information regarding its policies and procedures for complying with its obligations under the ACPA.

Lastly, Namecheap's argument that a registrar should be afforded broad immunity "for the act of registration of a domain name" is unavailing. (Ex. 15 at p. 3.) Here, Namecheap was not merely registering a domain name. Instead, Namecheap breached its obligations under the ACPA by failing to place proper controls on the Domain Name during pending litigation, allowing the Domain Name to be transferred. Moreover, Namecheap also provided privacy services to the new registrant of the Domain Name. In *Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1105-06 (C.D. Cal. 2009), the court held that Namecheap was not entitled

to immunity where it did not act as a registrar, and found that providing anonymity services is outside the core function of a registrar. As such, Namecheap cannot claim immunity for the damages that Plaintiff suffered as a result of Namecheap providing privacy services to the new registrant.

From the time Plaintiff's counsel first contacted Namecheap on October 21, 2025, regarding the new registrant's redacted Whois information, to the filing of this motion, Plaintiff has incurred at least $50,385.55 in additional costs and attorney's fees as a result of Namecheap's failure to comply with its obligations under the ACPA. (Luong Decl., ¶¶ 20-23.)

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff's *Ex Parte* Motion and issue an order to show cause requiring nonparty Namecheap, Inc. to appear and show cause why Namecheap has failed to comply with the Anti-Cybersquatting Consumer Protection Act, and why Namecheap should not be ordered to reimburse Plaintiff for reasonable expenses, including attorneys' fees, incurred as a result of Namecheap's noncompliance.

DATED: August 14, 2026 BROWER LAW GROUP, APC

By: */s/ Steven Brower*
Steven Brower

Attorneys for Plaintiff
Greenberg Gross, LLP