FENNEMORE CRAIG, P.C.
Mario C. Vasta (No. 033254)
Claire A. MacCollum (No. 039940)
2394 E. Camelback Rd., Suite 600
Phoenix, Arizona 85016-9077
Telephone: (602) 916-5000
Email: mvasta@fennemorelaw.com
Email: cmaccollum@fennemorelaw.com

Attorneys for Non-Party Namecheap, Inc.

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Greenberg Gross, LLP,<br><br>Plaintiff,<br><br>v.<br><br>GreenbergGrossLLP.com,<br><br>Defendant. | Case No. CV-25-01176-PHX-MTL<br><br>**NON-PARTY NAMECHEAP, INC.'S RESPONSE TO ORDER TO SHOW CAUSE** |

Non-party Namecheap, Inc. ("Namecheap") responds to the September 28, 2026 Order to Show Cause ("Order"). (Doc. 35.) Namecheap transferred GreenbergGrossLLP.com (the "Domain Name") to Plaintiff Greenberg Gross LLP ("Plaintiff") on April 14, 2026, leaving only a dispute over the fees and costs Plaintiff attributes to the expiration and subsequent registration of the Domain Name. (Doc. 33-1 ¶¶ 19–23.) Resolving that dispute requires consideration of both (1) the registrar's statutory duties and (2) the separate requirements for an award of sanctions.

***First***, Namecheap did not "transfer, suspend, or otherwise modify" the Domain Name within the meaning of the Anticybersquatting Consumer Protection Act ("ACPA") while the dispute was pending. Instead, the Domain Name expired because neither the registrant nor Plaintiff deposited the fees to renew the registration. When a registrar "locks" a domain to prevent its transfer or modification, the lock does not prevent the domain from expiring at the end of its term. Here, Plaintiff was on notice that the Domain Name was going to expire on July 31, 2025, and, despite that notice, Plaintiff took no action to renew the Domain Name. (Doc. 6-2 at 1.) The Domain Name expired, ceased to exist, and subsequently was registered by a second registrant. The privacy service that anonymized the contact information of the second registrant was automatically implemented by default because the second registrant did not opt out at the time of registration, according to Namecheap's standard policies intended to comply with applicable privacy laws and the regulations.

***Second***, Namecheap did not act in bad faith or with reckless disregard of its ACPA obligations. Before the Domain Name expired, Plaintiff neither offered to fund renewal nor communicated with Namecheap about its duties as registrar. It mailed court papers addressed to the Domain Name "c/o Namecheap," without a cover letter or instructions, in an action to which Namecheap was not a party. Namecheap reasonably understood the papers to be for the registrant and forwarded them; the Domain Name had already expired when the second and third mailings arrived. Plaintiff first questioned Namecheap's ACPA compliance only after Namecheap produced the second registrant's information in response to a subpoena. The ACPA did not require Namecheap to fund another registration term, and nonrenewal

did not violate its anti-transfer provision. The Court should deny sanctions.

## I. FACTUAL BACKGROUND

Namecheap is a domain name registrar accredited by the Internet Corporation for Assigned Names and Numbers ("ICANN"), with more than 24 million domain names under management for customers worldwide. Declaration of Hillan Klein, dated October 12, 2026, attached as **Exhibit A** ("Klein Decl.") ¶¶ 3-4. On April 8, 2025, Plaintiff commenced this *in rem* case alleging a cause of action under the ACPA against the Domain Name. (Doc. 1.) With its Amended Complaint, Plaintiff attached a Whois record which identified July 31, 2025 as the expiration date for the Domain Name. (Doc. 6-2 at 1.)

On July 31, 2025, the original registration of the Domain Name expired. (Doc. 33-12 at 1.) Each top-level domain, such as .com or .org, is managed by a central registry that is a separate entity from Namecheap. (Klein Decl., ¶ 6.) In the case of a .com domain, like the Domain Name, the central registry is Verisign. (*Id*.) When a .com domain is registered by a Namecheap customer, Namecheap must pay Verisign fees to renew and maintain the domain's registration. If the payment is not made, Verisign follows a strict expiration and deletion lifecycle that is set by ICANN, the organization that oversees the internet's Domain Name System. (*Id*. ¶¶ 3, 7.)

On August 4, 2025, Namecheap received a copy of the Notice of Defendant's Non-Response to Plaintiff's Motion for Default Judgment, addressed to "GreenbergGrossLLP.com c/o Namecheap, Inc.," with no accompanying letter or instructions directed to Namecheap. (Klein Decl., ¶ 11.) Believing the notice was intended for the Domain Name registrant, Namecheap forwarded it to the registrant. (*Id*.) On August 27, 2025, Namecheap received a copy of the Motion for Default Judgment and an unsigned, proposed order, with no additional cover page or instructions addressed to Namecheap. (*Id*. ¶ 12.0 Namecheap again believed the intended recipient was the Domain Name registrant and forwarded the packet to the registrant. (*Id*.) The Court later denied Plaintiff's initial motion for default judgment and set aside the default because Plaintiff had not served the registrant as the ACPA required. (Doc. 35 at 1.)

On September 9, 2025, a different customer registered the Domain Name. (Doc. 33-12 at 1.) Registration is an automated process. (Klein Decl., ¶ 5). If a name is available, it can be registered on a first-come, first-served basis. (*Id.* ¶ 3.) By default, the personal information of Namecheap customers contained in public Whois records is anonymized. (*Id.* ¶ 23.) The privacy service is provided through automated means, unless the customer opts out. *Id.* This is a company-wide policy intended to comply with privacy laws, such as the General Data Protection Regulation (GDPR), as well as the rules of ICANN, and to protect customers from having their personal information published on the internet. (*Id.* ¶¶ 20, 26.) When the Domain Name was registered a second time on September 9, 2025, the privacy service was automatically implemented by default because the customer did not opt out. (*Id.* ¶¶ 24-25.) No human at Namecheap made any affirmative choice to implement the privacy service for this specific domain. (*Id.* ¶ 25.)

On October 21, 2025, Plaintiff emailed Namecheap to request additional information. (Doc. 35 at 1–2.) Namecheap requested a U.S. court order or subpoena, in accordance with its general policies concerning disclosure of customer or account information. (Klein Decl., ¶¶ 27-29 & Ex. 4.) After Plaintiff provided a subpoena, Namecheap produced the registrant information and registration history on December 8, 2025. (Doc. 33-3 at 2, 5; Doc. 35 at 2.) Plaintiff notified the new registrant of this action on December 10, 2025, and obtained a publication waiver and entry of default on February 12, 2026. (Doc. 35 at 2.) On February 17, 2026, Plaintiff provided Namecheap with a copy of the Court's February 12 Order and Clerk's Entry of Default, and requested transfer of the Domain Name. (Klein Decl., ¶ 31; Doc. 33-5 at 1.) On February 26, 2026, Namecheap agreed to transfer the Domain Name, and its technical team requested account information from Plaintiff necessary to proceed with the transfer. (Klein Decl., ¶¶ 32-33 & Exs. 5-6.) Plaintiff said it would provide the necessary information. (Klein Decl., Ex. 7.)

Plaintiff delayed supplying the information needed to proceed with the transfer, however. (Klein Decl., ¶ 34). Instead, Plaintiff's counsel began demanding payment from Namecheap, and asserted that Namecheap had violated the ACPA by failing to stop a

transfer of the Domain Name as described above on September 9. (Klein Decl. Ex. 8.) Namecheap explained to Plaintiff's counsel that the Domain Name's original term had ended and a third party had purchased a new registration, rather than Namecheap allowing a transfer from the original account. (Doc. 33-12 at 1.) Ultimately, counsel for Namecheap declined to pay Plaintiff.

On April 14, 2026, Plaintiff's counsel provided the information necessary for the transfer. (Klein Decl., ¶ 35 & Ex. 9.) Namecheap completed the transfer the same day. (*Id.* ¶ 36.) Plaintiff now seeks more than $50,000 in attorneys' fees and expenses from Namecheap after obtaining the Domain Name. (Doc. 33-1 ¶¶ 19, 23.) Plaintiff requests $50,310 in attorneys' fees and $75.55 in postage. (Doc. 33-1 ¶ 23.) Plaintiff's supporting declaration supplies aggregate hours and categories of work, but no individual time entries or allocation among tasks. (Doc. 33-1 ¶¶ 20–23.)

## II. ARGUMENT

### A. Expiration of the registration did not violate the ACPA.

The ACPA requires a registrar that receives notice of a filed complaint to refrain from transferring, suspending, or otherwise modifying the disputed domain name during the action, except by court order. 15 U.S.C. § 1125(d)(2)(D)(i)(II). The statute does not, however, require a registrar like Namecheap to extend an unpaid domain name registration beyond its existing term. 15 U.S.C. § 1125(d)(2)(D)(i)(II). Plaintiff's position depends on reading that additional obligation into the prohibition against modification.

The account history distinguishes the end of the original customer's paid term from the later re-registration. The "marshalcage" account's registration expired on July 31, 2025. After the expired Domain Name returned to the pool of available domains, a second registrant with no identified connection to the first registrant re-registered the same name on September 9, 2025. Klein Decl. ¶¶ 7-8, 13, 17. Namecheap's production identified "belvana" as the later account. *Id.* A registrar lock prevents transfer or modification of a domain, but it does not prevent the domain from expiring at the end of its term. *Id.* ¶ 15. Here, Plaintiff was on notice that the Domain Name would expire on July 31, 2025—as demonstrated by Exhibit

B to its own Amended Complaint (Doc. 6-2 at 1)—but did not deposit the funds to maintain the original customer's registration for an additional term. Moreover, Plaintiff's reliance on the words "otherwise modify" does not resolve the renewal question. *See* Doc. 33 at 8-9. Preventing changes to a registration and purchasing another registration term are distinct obligations. The ACPA does not require Namecheap to keep the former customer's unpaid registration in force. The Court should decline to convert the non-transfer provision of the ACPA into an obligation for registrars to fund renewal.

**B. Namecheap was not required to pay the renewal charges.**

Neither the ACPA nor the contractual provisions cited by Plaintiff task Namecheap with the burden of paying the central registry to prevent expiration of the Domain Name. Namecheap "simply could not function as a registrar, or as keeper of the registry, if it had to become entangled in, and bear the expense of, disputes regarding the right of a registrant to use a particular domain name." *Lockheed Martin Corp. v. Network Sols., Inc.*, 141 F. Supp. 2d 648, 655 (N.D. Tex. 2001).

Typically, when a domain name is involved in litigation, the party seeking to acquire the domain deposits the fees necessary for its renewal. Klein Decl., ¶ 14. ICANN's Registrar Accreditation Agreement ("RAA") contemplates cancellation after nonrenewal, while permitting renewal without express registrant consent when litigation presents an extenuating circumstance. Doc. 33-17 at 11-12, §§ 3.7.5–3.7.5.2. But granting permission to renew the domain does not require Namecheap to bear the expense, as Plaintiff suggests.

The administrative dispute procedures applicable to domain names reinforce this allocation of responsibility. Under the Uniform Domain Name Dispute Resolution Policy ("UDRP"), a complainant may renew or restore a disputed registration on the registrant's commercial terms. RAA § 3.7.5.7 (Doc. 33-17 at 12). The World Intellectual Property Organization's guidance likewise places renewal fees with the disputing parties. (Doc. 33-16 at 2.) Although UDRP procedures do not directly govern this action, they illustrate how a disputed registration may be preserved without requiring the registrar to finance it.

Plaintiff had a means to maintain the registration without shifting that expense to

Namecheap. Plaintiff knew based on its own filing that the Domain Name was set to expire on July 31, 2025. (Doc. 6-2 at 1.) Renewal required payment of the registry fees necessary to maintain the registration, and Plaintiff could have arranged payment through Namecheap before expiration. Plaintiff did not do so; Namecheap has no record of any communication from Plaintiff, or anyone else, seeking to arrange payment to prevent the Domain Name from expiring. Klein Decl., ¶ 16. Nor did Plaintiff obtain an order addressing renewal before the term ended. (Doc. 33-16 at 1–2.) The resulting expiration does not establish any breach of the ACPA by Namecheap.

**C. The ACPA distinguishes registration services from actionable misconduct.**

The ACPA provides qualified protections for registrars performing registration services. Section 1114(2)(D)(iii) provides a safe harbor that insulates registrars from liability for registering or maintaining another's domain, absent a bad faith intent to profit. Sections 1114(2)(D)(i)(I) and (ii) protect specified actions implementing court orders or reasonable anti-infringement policies. The *in rem* provision of the ACPA separately limits relief against registrars, except in cases where the registrar acted in bad faith or with reckless disregard. 15 U.S.C. § 1125(d)(2)(D)(ii). Ninth Circuit decisions likewise distinguish ordinary registration activity from a registrar's own misconduct. The ACPA does not impose contributory cybersquatting liability. *Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 737 F.3d 546, 550-53 (9th Cir. 2013). Similarly, the court in *Rigsby v. GoDaddy Inc.* treated a new customer's registration following nonrenewal as ordinary, non-actionable registrar activity. 59 F.4th 998, 1006-07 (9th Cir. 2023). Indeed, the court in *Rigsby* expressly held that "letting a third party purchase an available domain name is standard practice for a domain name registrar." *Id.* at 1006. *Rigsby* did not address preservation during a pending *in rem* action; it does, however, distinguish ordinary registrar activity from actionable misconduct.

The record forecloses any finding of bad faith or reckless disregard under the *in rem* provision of the ACPA. The statute identifies the paradigm of reckless disregard as "a willful failure to comply with any such court order." 15 U.S.C. § 1125(d)(2)(D)(ii). No order

directed Namecheap to do anything before the Domain Name expired. The only papers Namecheap received before expiration were the summons and Amended Complaint, addressed to the Domain Name "c/o Namecheap," in a suit that did not name Namecheap, and which were unaccompanied by any request or instruction directed to it. Klein Decl. ¶¶ 9-10. At the time, Namecheap reasonably understood the "c/o" mailings as papers to be forwarded, forwarded them, and received nothing from Plaintiff suggesting that Plaintiff expected Namecheap to hold, renew, or fund the registration. *Id.* ¶¶ 10-12, 16. When Plaintiff later presented the Court's February 12, 2026 Order to Namecheap and asked whether it was sufficient for transfer, Namecheap confirmed receipt, requested the information needed to effectuate the transfer, and completed the transfer the same day Plaintiff supplied the information. *Id.* ¶¶ 31-36. Accordingly, Namecheap did not act in bad faith or recklessly disregard its obligations.

**D. The record does not support an award of sanctions.**

Sanctions under the Court's inherent power require a willful violation of a court order or conduct undertaken in bad faith; absent willful disobedience, bad faith requires proof of bad intent or an improper purpose. *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1090 (9th Cir. 2021). Negligence is insufficient, and recklessness must be accompanied by an additional factor such as frivolousness, harassment, or an improper purpose. *Fink v. Gomez*, 239 F.3d 989, 993-94 (9th Cir. 2001). The Court must make specific findings supporting that culpability. *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648-49 (9th Cir. 1997). This requirement applies to nonparties as well. *Corder v. Howard Johnson & Co.*, 53 F.3d 225, 232 (9th Cir. 1995).

A finding of noncompliance would therefore begin, rather than end, the sanctions inquiry. The Ninth Circuit distinguishes an underlying statutory violation from the culpability necessary to invoke inherent authority; ignorance or inadvertence alone does not support that additional remedy. *In re Dyer*, 322 F.3d 1178, 1196-97 (9th Cir. 2003) (finding that, in the bankruptcy context, ignorance did not warrant sanctions). Thus, even if the Court rejects Namecheap's interpretation of the anti-transfer provision, that ruling would not itself

establish bad faith or conduct tantamount to bad faith.

In *The Armored Grp., LLC v. Supreme Corp.*, this District declined sanctions for a protective-order violation where sworn explanations supported oversight and corrective action. No. CV 09-414-PHX-NVW, 2010 WL 653454, Doc. 88, at 3 (D. Ariz. Feb. 22, 2010). Here, the expiration and new registration followed automated processes, and the privacy protections for the new customer's registration applied by default. *See* Klein Decl. ¶¶ 5, 7, 13, 17, 23-25. The entirely automated nature of the services precludes any volitional conduct or subjective intent required for a finding of bad faith under the ACPA. *See Acad. of Motion Picture Arts & Scis*., CV 10-03738 AB (CWX), 2015 WL 5311085, at *29 (given the "entirely automated" nature of registrar's parked page system, registrar lacked the subjective intent necessary to support bad faith under the ACPA).

Namecheap's handling of the litigation papers weighs against an inference of deliberate obstruction. Each time Plaintiff mailed papers addressed to "GreenbergGrossLLP.com c/o Namecheap," with no letter or instructions directed to Namecheap, Namecheap forwarded them to the Domain Name registrant—the summons packet in April 2025, and the nonresponse notice and default-judgment packet in August 2025. Klein Decl. ¶¶ 9–12. Nothing Plaintiff sent put Namecheap on notice that Plaintiff expected anything from it beyond forwarding. The August packet included an unsigned proposed order, not an entered directive requiring transfer. Klein Decl. ¶ 12; Doc. 17-2 at 1-2. Namecheap did not act with the culpability required for sanctions.

The use of the privacy service also does not support a finding of sanctionable conduct. As discussed above, the privacy service is automatically implemented for all registrations, unless the customer opts out, in order to comply with privacy laws and regulations concerning the disclosure of customers' personal information. The privacy service applied by default to the later account's registration, before Plaintiff's October 21 inquiry; it was not separately activated in response to that request. Klein Decl., ¶ 23-25. After Plaintiff emailed the discovery order and subpoena to Namecheap on November 14, Namecheap acknowledged receipt on November 17 and produced the requested materials for both

accounts on December 8. *Id*. ¶ 30; Doc. 33-3 at 2-4.

Plaintiff cites *Solid Host, NL v. Namecheap, Inc.* for the proposition that "providing anonymity services is outside the core function of a registrar" (Doc. 33 at 14), but that case concerned allegations that Namecheap listed *itself* as the registrant in the Whois record, acting as a proxy for the customer, through a different kind of anonymity service than the one Namecheap currently uses. *See* 652 F. Supp. 2d 1092, 1103-06 (C.D. Cal. 2009). *Solid Host* was also abrogated in part by *Petroliam Nasional Berhad*, which rejected the existence of a cause of action for contributory cybersquatting under the ACPA. 737 F.3d at 550-53. Namecheap's response to the transfer request likewise weighs against sanctions. Plaintiff's February 17 email supplied the publication-waiver order and clerk's entry of default and asked whether those documents were sufficient for transfer. Klein Decl., ¶ 31; Docs. 29–30; Doc. 33-3 at 1. Namecheap agreed to proceed on February 26, 2026 and requested the receiving-account information. Klein Decl., ¶¶ 32-33; Docs. 33-5–33-7, 33-12. Namecheap completed the transfer on April 14, 2026, the same day Plaintiff supplied the necessary information. Klein Decl., ¶ 33-37; Doc. 33-1 ¶ 19.

**E. Alternatively, any award must be confined to reasonable expenses caused by proven misconduct.**

An award of compensatory fees under the Court's inherent power must satisfy both causation and reasonableness. Recovery is limited to expenses that would not have been incurred but for the misconduct; timing alone does not establish that causal connection. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108–10, 113–14 (2017). Accordingly, "the fee award may go no further than to redress the wronged party 'for losses sustained'; it may not impose an additional amount as punishment for the sanctioned party's misbehavior." *Id.* at 108 (quotation omitted). The Court may not dispense with that causal connection. *Id.* at 110.

Plaintiff cannot recover service and default expenses it would have incurred even if the original registration had remained unchanged. Its initial default failed because it had not notified the registrant as required. (Doc. 35 at 1.) Work that was done merely to correct that defect or establish entitlement to relief was necessary regardless of the later registration.

More fundamentally, the expiration that Plaintiff blames for its later expenses traces to Plaintiff's own inaction. Plaintiff knew the expiration date from its own filing, yet never contacted Namecheap to arrange the renewal deposit that a party seeking a disputed domain ordinarily makes. Klein Decl. ¶¶ 14, 16; Doc. 6-2 at 1. Likewise, the seven weeks between Namecheap's February 26 request for transfer information and the April 14 transfer reflect Plaintiff's delay in supplying that information while it pressed payment demands. Klein Decl. ¶¶ 33–36. Expenses that flow from Plaintiff's own choices were not incurred "because of, and solely because of," any misconduct by Namecheap. *Goodyear*, 581 U.S. at 113.

Furthermore, Plaintiff has failed to provide documentation sufficient to support the more than $50,000 in fee sanctions claimed. The fee applicant bears the burden of documenting the hours claimed, and inadequately documented time may be reduced when the submission prevents meaningful review of particular activities. *See Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948-49 (9th Cir. 2007). Here, Plaintiff's total hours and broad categories do not show how much time addressed the conduct it contends to be sanctionable, whether that work was necessary, or whether counsel duplicated their efforts. Instead, its declaration groups together various categories. (Doc. 33-1 ¶¶ 20-23.) No award should be granted. But, if the Court does grant any award, Plaintiff should first identify the tasks, dates, hours, rates, and expenses attributable to the conduct found sanctionable, with an opportunity for Namecheap to respond.

## III. CONCLUSION

Namecheap respectfully requests that the Court discharge the Order and deny sanctions. The ACPA did not require Namecheap to fund renewal of the Domain Name, and the record does not establish the culpability necessary for an award of sanctions. Alternatively, any award must be confined to reasonable expenses caused by proven misconduct, after affording Namecheap an opportunity to respond.

DATED this 12th day of October, 2026.

FENNEMORE CRAIG, P.C.

By: *s/ Mario C. Vasta*
Mario C. Vasta
Claire A. MacCollum
*Attorneys for Non-Party Namecheap, Inc.*

66453291

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2026, I caused a true and correct copy of the foregoing to be served by email on the following, who is not a registered participant of the CM/ECF System:

Steven Brower
Brower Law Group, APC
100 Pacifica, Suite 160
Irvine, California 92618
Steve@BrowerLawGroup.com
*Attorneys for Plaintiff Greenberg Gross, LLP*

Marie Elena Cobb

An employee of Fennemore Craig, P.C.